IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL WESLEY, | : | |
| Plaintiff, | : | 1:13-cv-2226 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| JOHN E. WETZEL, *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM

### July 22, 2016

Plaintiff Daniel Wesley ("Wesley"), a Pennsylvania state inmate, incarcerated at the State Correctional Institution at Coal Township ("SCI-Coal Township") at all times relevant, commenced this civil rights action on August 23, 2013. (Doc. 1). Remaining for disposition is Wesley's claim that Defendants Dr. Mark Baker ("Dr. Baker") and Dr. John Popick ("Dr. Popick") were deliberately indifferent to his Eighth Amendment right to adequate medical treatment in denying him surgery to reverse a colostomy. (*Id.*)

Presently pending is a motion (Doc. 158) for summary judgment pursuant to Federal Rule of Civil Procedure 56 filed on behalf of Drs. Baker and Popick. Although Wesley filed a brief in opposition to the motion, he failed to respond to the statement of material facts. For the reasons set forth below, the statement of material facts will be deemed admitted and the motion for summary judgment will be granted.

I.    **STANDARD OF REVIEW**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d

Cir. 1996). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex.* at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## II.   STATEMENT OF MATERIAL FACTS

"A motion for summary judgment filed pursuant to FED. R. CIV. P. 56 shall be accompanied by a separate, short and concise statement of the material facts . . . as to which the moving party contends there is no genuine issue to be tried." *See* L.R. 56.1.  The opposing party shall file a separate statement of the material facts as to which it is contended that there exists a genuine issue to be tried.  *Id.*  "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."  *Id.*  Wesley failed to oppose Defendants' statement of material facts (Doc. 159) even though he was informed that his failure to do so would result in the facts being deemed admitted.  (Doc. 162).  Consequently, all facts contained therein are deemed admitted.

On October 10, 2002, prior to his incarceration, Wesley suffered a gunshot wound to the abdomen that required surgery and resulted in a colostomy.  (Doc. 159, ¶ 3).  On April 15, 2005, during his incarceration at the State Correctional Institution at Frackville, Dr. Scott Sterling ("Dr. Sterling") requested a surgery consult to evaluate the possibility of a colostomy reversal.  (*Id.* at 4).  On April 20, 2005, Dr. Stanish, of Corizon, recommended that Wesley continue his present conservative treatment and that his closure request be evaluated annually.  (*Id.* at 5).

In April 2006, at Dr. Sterling's request, Dr. Stanish revisited the possibility of a colostomy reversal. (*Id.* at 6). Dr. Stanish noted that, generally, reversals of such procedures were not performed if they were done outside the prison; he sought additional information including where Wesley had the original colostomy surgery and whether the treatment plan called for reversal. (*Id.*)

On May 6, 2006, Wesley was admitted to Ashland Regional Medical Center for abdominal pain and bloating. (*Id.* at 7). The examining physician suspected a bowel obstruction secondary to a volvulus or hernia. (*Id.*) The following day, an exploratory laparotomy revealed that Wesley was suffering from a perforation of the descending colon. (*Id* at 8). This necessitated a left colon resection and creation of a new colostomy stoma. (*Id.* at 8).

On May 1, 2012, Wesley reported to the medical department at SCI-Coal Township complaining of abdominal pain. (*Id.* at 13). He was seen by both a physician's assistant and a physician. (*Id.*) Although he had positive bowel sounds, his stoma was discolored around the edges, his bowel was swollen and coming through the stoma, he had some bloody drainage and some fecal material in the colostomy bag and he reported significant pain. (*Id.*). He was taken *via* ambulance to Shamokin Area Community Hospital emergency room. (*Id.* at 13-14). It was determined that "[n]o acute problem that required hospital admission or urgent surgery was found at this time." (*Id.* at 14). His colostomy bag was

replaced and he was given morphine for pain. (*Id.*) He was discharged from the hospital to the custody of prison officials and, upon his return to the prison, was kept in the prison infirmary for observation. (*Id.* at 15). The attending doctor noted the change in colostomy bag. (*Id.* at 15). His vital signs were stable and his abdomen was soft and non-distended. (*Id.* at 16). His colostomy was functioning, passing soft brown stool. He denied any pain or discomfort. (*Id.*) The physician saw him the following morning, noted him to be stable, and discharged him from the infirmary. (*Id.*)

Thereafter, Dr. Stanish approved a surgical consult to determine if reversal of the colostomy was an option. (*Id.* at 17). On June 25, 2012, he was seen by Dr. Robert Khoo ("Dr. Khoo") for a surgery consultation. Dr. Khoo performed a complete physical and noted "some stomal prolapse" with the appliance off, and "would consider colostomy revision; however surgery cannot be done until surgical history is obtained from prison." He also observed that "no matter how large a stomal prolapse is noted, these do not usually cause pain or obstruction. While this can be repaired surgically, it is unclear why this would decrease his abdominal wall pain." "Before proceeding I want to obtain his prior surgery records to review in detail." (*Id.* at 18).

Dr. Stanish reviewed the surgical consult notes the same day and noted that Geisinger was in need of records from the prior surgery before doing any repair.

(*Id.* at 18, 19). A few weeks later, on July 17, 2012, Dr. Stanish documented that "patient hesitant to reveal that he used a false name to obtain abdominal surgery post gunshot wound in 2002." (*Id.* at 19). Dr. Stanish recognized that this posed a stumbling block to meeting Geisinger's request for the original medical records. He noted that they would continue to try to obtain the records, and documented the name Jerome or Jevone Prunty. (*Id.* at 20).

Wesley was seen approximately every two months for routine colostomy maintenance; there were no signs of infection, the colostomy was intact, the bag was changed when warranted, and Wesley had no complaints. (*Id.* at 22, 25).

On November 2, 2012, Wesley was seen by a physician's assistant who noted that the site was functioning well with no visible abnormalities. (*Id.* at 26). However, Wesley complained that his colostomy site gets irritated after eating beef and soy. (*Id.* at 26). (*Id.*) He was advised to avoid those foods and to return if his symptoms worsened. (*Id.*)

On November 21, 2012, Dr. Popick, a physician who provided medical care to inmates at SCI-Coal Township, referred Wesley to Dr. Khoo for another surgical consultation. (*Id*. at 2, 27).

On November 28, 2012, Wesley was seen by a physician's assistant for complaints of excruciating pain, feelings of nausea, fever, chills and numbness. (*Id.* at 28). He was alert and oriented but in moderate distress. (*Id.*) The physical

examination revealed that his stoma was protruding and he had no bowel sounds in the right lower quadrant with reduced bowel sounds throughout, which indicated a herniated bowel. He was injected with pain medication and taken by ambulance to the emergency room at the Shamokin Area Community Hospital. (*Id.* at 28, 29). Blood work was done, and a CT scan of his abdomen revealed a small periosteal herniation of a loop of small bowel, but no evidence of incarceration or small bowel obstruction. (*Id.* at 29). Follow up with general surgery on an outpatient basis was recommended and he was released and returned to the prison the same day. (*Id.*) He presented to the medical department with complaints of pain the next day. Following an examination, the physician's assistance prescribed 600 mg of Motrin, twice a day. It was noted that Wesley was scheduled to be seen by a surgeon. (*Id.* at 30).

On December 7, 2012, Wesley sought medical care because he was experiencing pain and was having difficulty reducing the hernia. (*Id.* at 31). He was seen by a nurse who encouraged him to lie down, relax, and continue trying to self-reduce the hernia at the stoma. (*Id.*). He was given 500 mg of Tylenol and, after some time, Wesley reported that the reduction was working and his pain was decreasing. (*Id.*) He was released with instructions to return if necessary. (*Id.*)

On January 14, 2013, Wesley was seen by Dr. Khoo at Geisinger. (*Id.* at 33). Dr. Khoo reiterated that the stomal prolapse was not significant and did not

appear to be causing any pain or complications; it was not apparent that surgery would address Wesley's complaints. *Id.* He stated that "[the patient] desires colostomy closure and I can try but of course can not [sic] provide a guarantee. The first task is laparotomy and a tedious adhesiolysis will be necessary and I will then look for the rectal stump. If I cannot get through the adhesions the case cannot proceed. If I am successful and can find the stump I will then determine if it can be used. As it has been defunctioned for years so the rectum may be atrophied and not usable. Finally, if an anastomosis can be done, the risk of anastomosis leak was reviewed – this would lead to more surgery and another stoma." (*Id.* at 34, Doc. 159-1, p. 8). Wesley accepted the risks and signed the consent to proceed with surgery. (*Id.*)

Given Dr. Khoo's report, on January 22, 2013, Dr. Popick requested collegial review to discuss the possibility of a "laparotomy and adhesiolysis for possible stoma closure or revision." (Doc. 159, ¶ 35). On February 25, 2013, Dr. Popick and Dr. Baker, who was employed as Wexford Health Sources' Dedicated Utilization Management Physician for Pennsylvania, discussed the case in collegial review and agreed to look more closely at the entire case history, specifically Dr. Khoo's findings, before arriving at a treatment plan. (*Id.* at 2, 37). In addition, Dr. Baker recommended that Dr. Popick call Dr. Khoo to discuss other treatment options. (*Id.*)

On March 19, 2013, Dr. Popick informed Wesley of the alternative treatment plan and informed him that the matter would be resubmitted for collegial review at a later date. (*Id.* at 38). He noted that Wesley was very angry. (*Id.*) On April 12, 2013, Dr. Popick noted that collegial review again tabled consideration of additional surgery for Wesley pending further review of his case. (*Id.*)

On May 7, 2013, Drs. Popick and Baker again undertook review of Wesley's case. (*Id.* at 39). In concluding that the "risks out-weigh[ed] the reward" of performing the surgery, Dr. Baker considered Dr. Khoo's concern with the length of time that the rectum had been "defunctional," his conclusion that a reversal would not relieve reported abdominal pain, and the fact that Wesley underwent a second surgery in 2006, that resulted in the creation of a new colostomy rather than a reversal. (*Id.*)

On July 14, 2014, in accord with Wesley's March 15, 2014 request, Drs. Charles W. Walker and Khoo conducted an updated colostomy closure evaluation. (*Id.* at 43-44). Wesley reported that his parastomal hernia occasionally bulged out, caused pain and nausea, but it did not affect ostomy output. (*Id.* at 44; Doc. 159-1, p. 60). Dr. Walker concluded that a colostomy reversal "would most likely not be feasible due to the amount of time that [had] elapsed since the initial injury" and because "there would most likely not be any bowel to re-connect to." (*Id.*) Dr. Khoo agreed with Dr. Walker's assessment and stated as follows: "I again

reviewed the risks of surgery which are extensive with the patient. He insists he knows of friends with stomas in place as long as his, who have had successful reversal. My concern is that fecal diversion of this length of time would have led to atrophy of the diverted colorectal segment and anus so successful stoma reversal is less likely to succeed. I don't recommend surgery. See again as needed." (*Id.* at 45; Doc. 159-1, p. 60).

## III. DISCUSSION

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. *See* 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

*Id.; see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

For the delay or denial of medical care to rise to a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, a prisoner must demonstrate "(1) that defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Deliberate indifference requires proof that the official "knows of and disregards an excessive risk to inmate health or safety." N*atale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Deliberate indifference has been found where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a nonmedical reason; or (3) prevents a prisoner from receiving needed or recommended treatment." *Rouse*, 182 F.3d at 197. Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)). Allegations of negligent treatment or medical malpractice do not trigger constitutional protections. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976).

The record demonstrates that Wesley consistently received adequate medical attention. On each visit to the medical department his concerns were diligently addressed. Exams were conducted, medications were prescribed. He was admitted to the infirmary when necessary and transported to the hospital when warranted. In addition, he benefited from multiple surgical consultations. No claim of deliberate indifference is made out where a significant level of care has been provided, as is the case here, and all that is shown is that the prisoner disagrees with the professional judgment of a physician. *Estelle*, 429 U.S. at 105–06, 107 (finding that "in the medical context, . . . a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"); *Parham v. Johnson*, 126 F.3d 454, 458 n. 7 (3d Cir. 1997) (recognizing "well-established law in this and virtually every circuit that actions characterizable as medical malpractice do not rise to the level of 'deliberate indifference' "); *Durmer*, 991 F.2d at 67 (same). *See also Taylor v. Norris*, 36 F. App'x. 228, 229 (8th Cir. 2002) (finding that deliberate indifference claim failed because it involved a disagreement over recommended treatment for hernias and decision not to schedule a doctor's appointment); *Abdul-Wadood v. Nathan*, 91 F.3d 1023, 1024–35 (7th Cir. 1996) (holding that an inmate's disagreement with selection of medicine and therapy for sickle cell anemia falls well short of demonstrating deliberate indifference); *Czajka v.*

*Caspari*, 995 F.2d 870, 871 (8th Cir. 1993) (finding inmate's mere disagreement with doctor's informed decision to delay surgery does not establish Eighth Amendment claim). Courts will not second guess whether a particular course of treatment is adequate or proper. *See Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997) (quoting *Inmates of Allegheny Cnty. Jail*, 612 F.2d at 762). *See also, e.g., Gause v. Diguglielmo*, 339 F. App'x 132, 136 (3d Cir. 2009) (a dispute over the choice of medication does not rise to the level of an Eighth Amendment violation); *Rush v. Fischer*, No. 09-9918, 2011 WL 6747392, at *3 (S.D.N.Y. 2011) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs.").

Further, Wesley's argument that Defendants' decision not to approve surgery was economically motivated is wholly unsupported. (Doc. 161). The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). Wesley has failed to meet this burden. He fails to come forth with any credible evidence that would indicate that Defendants intentionally withheld medical treatment, *i.e.* denied him surgery for economic reasons and, in doing so,

inflicted pain or harm upon him.  *See Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); *Rouse*, 182 F.3d at 197.

## IV.   CONCLUSION

Based on the above, Defendants' motion (Doc. 158) for summary judgment will be granted.

A separate order will enter.